UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE SCALIA,

      Plaintiff,

v.                                                                              Case No. 1:18-cv-1183

AWP, INC.,                                                          Honorable Hala Y. Jarbou

      Defendant.

_____/

**OPINION**

Before the Court are cross-motions for summary judgment based on Defendant AWP, Inc.'s alleged violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* At issue is whether the FLSA requires AWP to compensate certain employees for the time they spend transporting crew members in company-provided vehicles on their way to and from the day's worksite. AWP provides flagging services and most of its employees are flaggers: they direct traffic around temporary work zones on roads.[1] Flagger-drivers are flaggers who have been issued company trucks. Though the extent to which they are actually required to do so is disputed by the parties, flagger-drivers almost always pick up assigned crew members on their way to a worksite and then drop them off at the end of the workday.

Plaintiff, the Department of Labor (DOL), claims that driving time after flagger-drivers pick up their partners must be compensated, as must be time spent dropping off partners after

---

[1] AWP refers to its flagger employees as "protectors." For clarity's sake, the Court will refer to such employees as flaggers.

leaving the worksite.[2]  (Pl.'s Mot. for Summ. J., ECF No. 50.)  AWP counters that the activity in question is exempted from compensation by the Portal-to-Portal Act (PPA), 29 U.S.C. § 251 *et seq.*, and the Employee Commuting Flexibility Act (ECFA), 29 U.S.C. § 254(a), which expands the reach of the PPA in certain circumstances.  (Def.'s Mot. for Summ. J., ECF No. 49.)  The DOL seeks unpaid wages, an injunction preventing anyone at AWP from withholding those unpaid wages, costs of the action, and a company-wide injunction against future violations of the FLSA. The present lawsuit is based on the DOL's investigation into AWP's Niles, Michigan location, but the Department claims that the challenged practices are employed at virtually all of AWP's facilities nationwide.

To win on summary judgment, the DOL must show that the activity in question is indisputably compensable under the FLSA and not exempted from compensation by the PPA or the ECFA.  It cannot demonstrate that the PPA and ECFA are indisputably inapplicable here, and therefore, the DOL is not entitled to summary judgment.  On AWP's part, it must show that the DOL cannot meet its burden of proof regarding one of the three exceptions to the FLSA at issue. Alternatively, it could show that, even under the DOL's version of the facts, one of the exemptions applies in this case.  Because AWP has not done either, it is likewise not entitled to summary judgment.

The Court sees two dispositive questions. First, does the job of "flagger-driver" encompass two work responsibilities – flagging and driving – such that it is a part of a flagger-driver's job to pick up flagger-passengers?  If not, is transporting a partner integral and indispensable to an AWP flagger's principal activity of flagging?  If the answer to either question is yes, then picking up and

---

[2] The DOL is not contending that employee-passengers must be compensated for travel time, as they are picked up at home and brought directly to the worksite (and brought directly home from the worksite at the end of the day).  Plaintiff treats this as a straightforward commute for the passengers, which means that such travel time is non-compensable.

dropping off partners would constitute the respective start and end of a flagger-driver's workday, and DOL regulations mandate that all travel time within a workday be compensated.

As will be discussed below, there are genuine disputes of material fact that must be resolved before the above questions can be answered.  Therefore, both motions for summary judgment will be denied, except with respect to the DOL's claim for liquidated damages, which it is no longer seeking.  AWP's motion will be granted solely to the extent it requests dismissal of the liquidated damages claim.  The DOL also made a separate motion arguing that some evidence presented by AWP is inadmissible and may not be considered by the Court in deciding summary judgment. (Pl.'s Obj., ECF No. 58.)  That motion will be denied as moot.

## I.   Factual Background

### A. Undisputed Facts

AWP provides traffic control services at client job sites.  (Joint Statement of Material Facts ¶ 4, ECF No. 56.)  This is primarily accomplished by sending AWP-employed flaggers to direct traffic around temporary work zones.  AWP employs around 3,600 flaggers across almost 80 facilities nationwide.  Flaggers typically work in teams of two.  In a two-person crew, one flagger will act as a spotter while the other sets up or tears down the work zones, as well as when maneuvering AWP-provided trucks.  Once a worksite is set up, the two flaggers will direct opposite flows of traffic at each end of the work zone.  AWP pickup trucks are dispatched to nearly every jobsite and are used to transport flagging equipment.  (*Id.* ¶ 23.)

AWP previously used a system of "central reporting," whereby flaggers would drive personal vehicles to their local AWP facility to meet their partner and pick up an AWP truck for use at the worksite.  (Peak Dep. 143, ECF No. 51-6.)  Flaggers were compensated for the time spent traveling between the facility and the worksite, i.e. after they met at the facility and picked up the AWP truck.  AWP began rolling out "direct reporting" in 2014, whereby one flagger would

be assigned an AWP truck to keep at home on the condition that the flagger-driver pick up his partner at an agreed-upon location before driving directly to the worksite, i.e. without first going to AWP's local facility.  (Joint Statement of Material Facts ¶ 6.)  Each night, flaggers receive a text assigning their worksite and partner for the following day.  Transporting partners adds about 30 minutes to a Niles flagger-driver's commute each way.  (Hillard Decl. ¶ 10, ECF No. 51-12.) Flagger-drivers are not compensated for any specific portion of their travel to or from worksites; rather, they are paid for daily travel time exceeding two hours (one hour each way).  (Joint Statement of Material Facts ¶¶ 28-29.)

At any given time, approximately half of the flaggers at the Niles facility are flagger-drivers.  (*Id.* ¶ 9.)  Though flagger-drivers are assigned to specific facilities, the Niles office borrows flagger-drivers from nearby AWP locations when it is short-staffed.

A flagger-driver's travel time to the passenger-pickup spot is tracked by smart tablet; upon arrival at the pickup spot, the passenger uses the tablet to confirm that he or she was picked up. (*Id.* ¶ 25.)  The tablet also tracks travel between the pickup spot and the worksite.  End-of-day travel from the worksite is not tracked; AWP simply assumes that the return trip will take as long as the travel time to the work zone.

### B. Disputed Facts

The parties dispute whether employees are permitted to drive their personal vehicles to worksites under the direct reporting system.  AWP states that across the company over about four years, flagger-drivers drove to worksites without a partner about 20% of the time.  (Peak Decl. ¶ 9, ECF No. 49-9.)  Half of such jobs involved a flagger-driver working alone, while for the other half, the flagger-driver's partner presumably drove a personal vehicle to the work zone.  (*Id.* ¶ 14.) AWP points to a Niles-based flagger who claims that one of his partners, Cheyenne Devour,

frequently drove her personal vehicle to and from worksites.[3]  (Kelley Decl., ECF No. 49-12.)  The current Facility Manager in Niles states that flaggers are permitted to "meet at the jobsite" and that he has never disciplined anyone for driving a personal vehicle to the worksite. (Nguyen Decl. ¶ 6-7, ECF No. 49-8.)

The DOL contends that flaggers are not permitted to drive personal vehicles to worksites, which necessitates transportation of partners by flagger-drivers.  It points to declarations from several former and current flaggers and a former manager, all of whom state that employees are not permitted to drive personal vehicles to worksites.  (Gabriel Hall Decl. ¶ 17, ECF No. 51-20 (former flagger); Szybowicz Decl. ¶ 12, ECF No. 51-22 (current flagger); MacLachlan Dep. 45, ECF No. 51-8 (former Niles facility manager).)  The former flagger states that the current Facility Manager, Thanh Nguyen, told him personal vehicles could not be parked at worksites, which directly contradicts Nguyen's own declaration.  (*Compare* Gabriel Hall Decl. ¶ 17 *with* Nguyen Decl. ¶¶ 6-7.)  The DOL also argues that the statistics put forward by AWP lack any basis or context to be trusted or understood; the statistics are not broken down by job type and may include customer equipment rentals involving no flagging at all.  Plaintiff suggests that Devour was only permitted to drive her personal vehicle to worksites because AWP was already under investigation and the company found it legally advantageous to allow her to do so.

Whether flaggers are permitted to drive personal vehicles to worksites is closely related to the first dispositive question, i.e., the parties dispute whether transporting a partner is part of the flagger-driver's job.  Based on essentially the same record detailed above, the DOL says they are

---

[3] Jason Kelley began flagging for AWP in June 2017 (Kelley Decl. ¶ 1, ECF No. 49-12), about four months after the DOL opened its investigation into AWP's challenged pay practices (Joint Statement of Material Facts ¶ 33).  The Court was not provided with any declaration from Cheyenne Devour, the flagger who Kelley claims frequently drove her personal vehicle to worksites.  It appears that she is no longer employed with AWP.  (*See* Kelley Decl. ¶ 4 (referring to Devour's activities in the past tense).)

required to do so, and AWP says they are not.  If AWP does not permit flaggers to drive their own cars to worksites, that would support an inference that transporting a partner is part of the flagger-driver's job.

Two final disputes revolve around a central issue: the nature of the job of flagging.  The DOL contends that the type of flagging AWP generally offers is fundamentally a two-person job.  Several former Niles-based flaggers state that it is not possible to completely set up a work zone without a partner.  (Gabriel Hall Decl. ¶ 7; Zacariah Hall Decl. ¶ 7, ECF No. 51-21.)  That is why, the DOL says, flagger-drivers are always assigned a partner whom they are expected to transport when they receive a job.  AWP counters that, while in many cases it is helpful to have a partner, two people are never truly required to complete the task of standing and directing traffic around a temporary work zone.  The company again cites to the challenged statistics regarding the number of jobs performed over the past four years that ostensibly involved a single flagger.

## II.  Standard

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for

6

trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).  In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Anderson*, 477 U.S. at 249.

## III. Analysis

### A. Operation of the FLSA

Three statutes are relevant in this case: (1) the FLSA itself; (2) the PPA, which amended the FLSA; and (3) the ECFA, which amended the PPA.  The PPA and ECFA exempt certain activities, such as commuting, from compensability under the FLSA.  Taken together, these laws dictate when an employer must compensate employees for certain activities.  A fair bit of legal description is required to make sense of the cross-motions for summary judgment.  Briefly, AWP must compensate flagger-drivers for the time they spend transporting partners if doing so is a principal activity of flagger-drivers.  Transporting partners would be a principal activity if it is one of the tasks for which a flagger-driver is hired, or if it is "integral and indispensable" to flagging.  If it is a principal activity or integral and indispensable to flagging, then the PPA and ECFA do not apply and the flagger-driver's travel time must be compensated because picking up and dropping off a partner would constitute the respective start and end of a flagger-driver's workday.  The DOL bears the burden of proving that the flagger-drivers must be compensated, and that neither the PPA nor the ECFA apply.

### 1. FLSA

The FLSA is designed to ensure that covered employees are paid for all time that they work, and that overtime wages are paid for all time worked in excess of 40 hours per workweek. The act does not define "work," "workweek," or "workday."  *See* 29 U.S.C. § 203 (definitions).

Early Supreme Court cases defined such terms broadly. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (reviewing development of Supreme Court jurisprudence on FLSA).

The Supreme Court defined work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R. R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944). The Court went on to hold that "exertion" was not strictly necessary for something to constitute work: "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co. v. Wantlock*, 323 U.S. 126, 133 (1944).

The term "workweek" was also given broad meaning. It covered "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946). Based on this definition, the Court in *Anderson* concluded that "the time necessarily spent by employees walking from timeclocks near the factory entrance gate to their workstations must be treated as part of the workweek." *Alvarez*, 546 U.S. at 25 (citing *Mt. Clemens Pottery*, 328 U.S. at 691-92). Employers, therefore, had to pay employees for their commute time.

### 2. The PPA amends the FLSA

Congress swiftly abrogated *Mt. Clemens Pottery* holding by passing the PPA to amend the FLSA. Section 254(a) of the PPA states:

> Except as provided in subsection (b) [not relevant here], no employer shall be subject to any liability or punishment under [FLSA] . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in . . .
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary or postliminary to said principal activity or
> activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

Thus, the PPA rendered commutes and other preliminary/postliminary activities non-compensable under the FLSA.[4]  *See also* 29 C.F.R. § 785.35 ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment.  This is true whether he works at a fixed location or at different job sites.  Normal travel from home to work is not worktime.").

### a.  Travel within workday not exempted by the PPA

The PPA did not "purport to change [the Supreme Court's] earlier descriptions of the terms 'work' and 'workweek,' or to define the term 'workday.'" *Alvarez*, 546 U.S. at 28.  Moreover, according to the DOL's subsequent interpretation, the PPA did not affect the compensability of any travel or other ancillary activities that occur *after* a workday commenced or *before* a workday ended.  *See* 29 C.F.R. § 790.6(a) ("[T]o the extent that activities engaged in by an employee occur

---

[4] Both parties' briefs, as well as a lot of case law, treat commuting and preliminary/postliminary activities as distinct concepts.  In truth, commuting/commute-like travel time (i.e. walking from a factory entrance to your workstation) are just *types* of preliminary/postliminary activities – ones that are expressly mentioned in the PPA.  *See* 29 C.F.R. § 790.7 ("The following 'preliminary' or 'postliminary' activities are expressly mentioned in the [PPA]: 'Walking, riding, or traveling to or from the actual place of performance of the principal activity or activities which (the) employee is employed to perform.").  All possible distinctions are erased by the required focus on activities that are "integral and indispensable" to an employee's principal activity (a standard that will be explained later) because the Supreme Court has held that all activities that are "integral and indispensable" count as principal activities.  *See Alvarez*, 546 U.S. at 37.  Hence, travel to "the actual place of performance of the [employee's] principal activity" in section 254(a)(1) really refers to *the first place* at which an integral and indispensable activity is performed.  *See id.* at 34 ("[W]e conclude that the locker rooms where the special safety gear is donned and doffed are the relevant 'place of performance' of the principal activity that the employee was employed to perform within the meaning of [the PPA].").

after the employee commences to perform the first principal activity on a particular workday, the provisions of [29 U.S.C. § 254(a)] have no application.").  That interpretation has been affirmed. *Alvarez*, 546 U.S. at 33-34, 37 ("[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the PPA], and as a result is covered by the FLSA.").

With respect to the compensability of preliminary or postliminary activities under the PPA, the critical inquiry is whether the workday has started.  Under the "continuous workday" doctrine, travel time after the workday has begun must be compensated.  *See* 1 Les A. Schneider & J. Larry Stine, *Wage and Hour Law: Compliance and Practice* § 6:8 (Nov. 2020 update) ("[D]octrine transforms activities that are usually non-compensable under the [PPA] . . . into compensable time under the FLSA.").

The workday begins when an employee performs his or her first activity that is integral and indispensable to the employee's "principal activity."  Per 29 C.F.R. § 790.6(b), "'Workday' as used in the [PPA] means, in general, the period between the commencement and completion on the same workday of an employee's principal activity or activities."  "[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under [section 254(a)] of the [PPA]."  *Alvarez*, 546 U.S. at 37.  Hence, the bounds of the workday are set by the first and last integral and indispensable activities performed by an employee.  *See id.* at 30, 33-34 (employees' workday began with putting on safety gear for work at slaughterhouse).

### b.  Meaning of "integral and indispensable"

The phrase "integral and indispensable" comes from *Steiner v. Mitchell*, 350 U.S. 247, 253 (1956).  The Court in *Steiner* held that the category "principal activity or activities" set forth in the PPA included tasks that are "an integral and indispensable part of the principal activities."  *Id.*

(internal quotations omitted).  Thus, integral and indispensable work was not exempted by the PPA and had to be compensated, even where such work was performed before or after the performance of activities that arguably constituted the employee's true job.  *See id.* at 249 (employees had to be compensated for time spent donning protective gear that would permit them to carry out the true purpose of employment: working with toxic chemicals to manufacture batteries).  Circuit courts have stated that "integral" and "indispensable" are separate prongs, and both are required to transform a non-compensable preliminary/postliminary activity into a compensable principal activity.  *See Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 592 (2d Cir. 2007); *Llorca v. Sheriff, Collier Cnty.*, 893 F.3d 1319, 1324 (11th Cir. 2018).

Yet *Steiner* did not provide an operative definition of "integral and indispensable."  The Supreme Court finally defined the phrase in *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014), stating that an activity is "integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those [principal] activities and one with which the employee cannot dispense if he is to perform his principal activities."  *Id.* at 33.

Hence, the employees in *Steiner* had to be compensated for time spent donning protective gear because they could not safely perform their job without such equipment.  *Id.* at 34 (citing *Steiner*, 350 U.S. at 249, 251).  On the other hand, time spent *waiting* to don protective gear (where donning the gear would itself be a compensable activity) is non-compensable "because such waiting [would be] 'two steps removed from the productive activity on the assembly line.'"  *Id.* (quoting *Alvarez*, 546 U.S. at 42).  Resolving the issue raised in *Busk* itself, the Court held that time spent waiting to go through a metal detector prior to leaving a warehouse to prevent employee theft was non-compensable.  *Id.* at 37.

Integrity Staffing operated a warehouse where the employees' job was to retrieve products from shelves and package those products for delivery to Amazon customers.  To prevent theft of goods from the warehouse, employees were required to go through a metal detector before leaving at the end of the workday.  The Court held that the security screening was not integral and indispensable to any principal activity because such screenings were not intrinsic to retrieving and packaging wares, and the screenings could have been "eliminated . . . altogether without impairing the employees' ability to complete their work."  *Id.* at 35.  That wait times could have been reduced to a *de minimis* amount by reforming the screening process was irrelevant to the Court;[5] the wait times were non-compensable according to the PPA because security screenings were not integral and indispensable to employees' principal activities.  *Id.* at 37.

The *Busk* Court further invalidated any test of compensability that hinges on whether a particular activity is required by the employer.  *Id.* at 36.  Tests that "turn[] on whether the activity is for the benefit of the employer" met the same fate.  *Id.*  The problem with such tests is that they "would sweep into 'principal activities' the very activities that the [PPA] was designed to address." *Id.*  "The integral and indispensable test is tied to the productive work that the employee is *employed to perform*."  *Id.* (citing *Alvarez*, 546 U.S. at 42) (emphasis in original).[6]

### c.  Applying *Busk* to DOL regulations

A key question is to what extent a particular regulation survives *Busk*.  29 C.F.R. § 785.38 states that

---

[5] Employers need not compensate employees for performing otherwise compensable activities if the time spent performing those activities is *de minimis*.  *Aiken v. City of Memphis*, 190 F.3d 753, 758 (6th Cir. 1999).

[6] The Court's rejection of tests that *turn on* whether the activity is required or benefits the employer should not be taken to mean that such questions are wholly irrelevant.  Presumably, integral and indispensable activities will be required by employers because of their importance to an employee's work, and such activities will likely benefit the employer.  Rather, *Busk* holds that the mere *fact* that an activity is required or benefits the employer does not necessarily mean that the activity is integral and indispensable.

> [w]here an employee is required to report at a meeting place to receive instructions
> or to perform other work there, or to pick up and to carry tools, the travel from the
> designated place to the work place is part of the day's work, and must be counted
> as hours worked regardless of contract, custom, or practice.

29 C.F.R. § 785.38.

Under part 785.38, reporting to a designated meeting place for instructions, tools, or other work, renders compensable the travel from that location to the ultimate worksite.  The language of the regulation does not appear to require that reporting to a designated location be treated as the *start* of a workday, only that travel from the location must be treated as hours worked.  29 C.F.R. § 790.6 defines "workday" and states that all activities within the workday are compensable.  It is plausible to read part 785.38 as saying travel time after reporting to a designated location must be compensated whether or not the workday has actually started.

However, such an interpretation has likely been foreclosed by *Busk* because merely asking whether an employee is required to do something is now insufficient for determining compensability.  If the travel time does not occur within the workday, then it is only compensable if that travel is integral and indispensable.  But under part 790.6(b), "workday" means "in general, the period between the commencement and completion . . . of an employee's principal activity or activities."  Yet *Alvarez* and *Steiner* dictate that integral and indispensable activities *are* principal activities.  Hence, for the travel covered by part 785.38 to be compensable, either the travel itself or the designated location that precedes it must be integral and indispensable which, in turn, means that reporting to a designated location constitutes the beginning of the workday under part 790.6(b).

For part 785.38 to have any meaning at all, it must be treated as a regulation defining certain events as integral and indispensable activities triggering the start of the workday.  Under *Alvarez*, this could only be true if reporting to a designated meeting place for instructions, tools, etc.

13

constituted an integral and indispensable activity. The question then becomes whether such activities are integral and indispensable under the definition set forth in *Busk*. It is probably safe to assume that reporting to a designated meeting place to get tools will almost always be integral and indispensable (if not, why do it in the first place?), but after *Busk*, it is doubtful that the regulation can be treated as providing a list of activities that are *per se* integral and indispensable. Instead, such activities must qualify as integral and indispensable within the meaning of *Busk* to be deemed principal activities.

### 3. The ECFA amends the PPA

In 1994, the DOL issued an Opinion Letter stating that, when an employee drove an employer-provided vehicle to work rather than a personal vehicle, "the time spent by [the] employee traveling from home to the first work assignment, or returning home from the last assignment . . . represented a principal activity, which must be compensated." H.R. Rep. No. 104-585, at 2 (1996). Congress subsequently passed the ECFA "to limit[] non-compensable travel to travel between the employee's home and work sites within the normal commuting area of the employer's establishment or service area." *Id.* at 4. The relevant language of the ECFA is tacked on to the end of section 254(a) of the PPA:

> Except as provided in subsection (b) [not relevant here], no employer shall be subject to any liability or punishment under [FLSA] . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in . . .
>
>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>>
>> (2) activities which are preliminary or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at

which he ceases, such principal activity or activities. **For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of such employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employees**.

29 U.S.C. § 254(a) (bold text added by ECFA).

There are three elements to the ECFA exception. Use of the employer-provided vehicle must be: (1) for commuting or *incidental* to commuting; (2) within the normal commuting area and; (3) subject to a vehicle-use agreement between the employer and employee.

### B. Theories of the Case

This is a complex case that requires applying a blurry, often circular, area of the law to detailed and contested facts. The best way to proceed is to lay out the parties' arguments with respect to each provision of the PPA and the ECFA. From there, it can be demonstrated why neither side is entitled to summary judgment.

### 1. Normal Travel Under Section 254(a)(1)

The Court believes that independent analysis of section 254(a)(1) of the PPA is not warranted in this case. It appears to the Court that section 254(a)(1) simply enumerates certain activities, commute-like in nature, that are a subset of all the preliminary/postliminary activities covered in section 254(a)(2). The DOL has promulgated regulations conforming to that interpretation. *See* 29 C.F.R. § 790.7 ("The following 'preliminary' or 'postliminary' activities are expressly mentioned in the [PPA]: 'Walking, riding, or traveling to or from the actual place of performance of the principal activity or activities which (the) employee is employed to perform.'"). Whether a preliminary or postliminary activity under section 254(a)(2) is compensable turns on whether that activity is integral and indispensable to an employee's principal activity. And if

section 254(a)(1) simply lists a subset of preliminary and postliminary activities, then those listed activities are compensable if they are integral and indispensable.

Legally speaking, a commute is work-bound travel devoid of integral and indispensable activities. If an employee were to perform a principal activity – or something integral and indispensable to that principal activity – on the way to work in the morning, then he or she must be compensated for that work under the FLSA. In the Court's reading, section 254(a)(1) would not render genuine work non-compensable simply because it was performed while the employee was traveling from home to work. Nor would it render travel itself non-compensable if that travel were somehow integral and indispensable to a principal activity. The Court cannot envision a scenario where something would be compensable under section 254(a)(2) but non-compensable under section 254(a)(1). In fact, case law suggests that performance of the first integral and indispensable activity triggers the start of the workday, making section 254(a)(1) wholly inapplicable. Nevertheless, the Court will first unpack the parties' arguments regarding section 254(a)(1).

### a. AWP offers an overbroad reading of "normal travel'

AWP argues that picking up and dropping off a partner is simply part of a flagger-driver's normal commute and thus non-compensable under section 254(a)(1) of the PPA. *See* 29 C.F.R. § 785.35 ("Normal travel from home to work is not worktime."). "Normal travel," as discussed in Section III.A.2, is a context-specific concept that looks to the particulars of specific employer-employee relationships. *See Kavanaugh v. Grand Union Co., Inc.*, 192 F.3d 269, 272 (2d Cir. 1999). For example, Employee B is not entitled to compensation for any portion of his commute simply because he lives further from work than Employee A. Nor does a commute become compensable because the worksite, say, a mine, is out of the way for everyone – travel to the mine is inherently part of the commute and thus non-compensable under section 254(a)(1). AWP argues

16

that transportation of a partner is part of the commute expected of flagger-drivers nationwide; the average commute for flagger-drivers across all facilities is 58 minutes, which is more or less within the range of the 63-minute average commutes at the Niles facility.[7]

AWP's argument is a little strange because it is circular in nature: AWP's "normal travel" time includes time spent transporting partners. Theoretically, the company could always pad this normal travel time by requiring flagger-drivers to pick up more employees on the way to work. Taken to the extreme, this argument implies that AWP could mandate that employees make, say, five stops, all out of their way, and this would still not be compensable because it is "normal travel" for AWP flagger-drivers. That seems off. Surely the definition of "normal travel" is not so contingent that a company could hire someone, call her an accountant, and then have her drive a bus around town transporting other employees for eight hours a day without compensation simply because her bus route is part of the "normal commute" as defined by her employer who imposes such travel arrangements on all "accountants."

   **b. DOL's argument only works if transporting partners is integral and indispensable or a principal activity, thus triggering the start of the workday**

The DOL counters that AWP misplaces reliance on 254(a)(1) and related cases and regulations because section 254(a)(1) essentially deals with direct home-to-work travel (and vice versa) and does not cover situations where an employee is first required to report to some designated place before heading to the ultimate worksite. A normal commute cannot include employer-mandated deviations from a more-or-less direct path from home to work, and vice versa. Hence, flagger-drivers exceed "normal travel" because, rather than go straight from A to B, they must first stop at C to pick up their partner. Under the DOL's theory, a flagger-driver's real

---

[7] The DOL argues that these statistics are inadmissible. (Pl.'s Obj. to Def.'s Decls.)

commute is only the first leg of the trip – the travel from their home to wherever they pick up their partner.  The act of picking up their partner amounts to reporting to an employer-designated location, which triggers the start of the workday and brings subsequent travel outside the ambit of the PPA.

DOL appears to be arguing that this is a *per se* rule and that it is irrelevant, for purposes of applying section 254(a)(1), whether picking up a partner is integral and indispensable to the principal activity of flagging.  This position seems troubling, though, because section 254(a)(1) appears to be a subset of all preliminary and postliminary activities mentioned in section 254(a)(2), which are only compensable if they are integral and indispensable.  DOL's actual argument would have to be that reporting to a designated location takes subsequent travel out of the PPA entirely.

Yet the Department contends that section 254(a)(2) of the PPA is inapplicable because transporting partners is an integral and indispensable activity.  This argument would not be necessary if part 785.38 *per se* rendered compensable all travel time subsequent to meeting at a designated location because, again, the DOL treats travel-based activities under section 254(a)(1) as preliminary and postliminary activities.  *See* 29 C.F.R. § 790.7 ("The following 'preliminary' or 'postliminary' activities are expressly mentioned in the [PPA]: 'Walking, riding, or traveling to or from the actual place of performance of the principal activity or activities which (the) employee is employed to perform.").  DOL's argument based on part 785.38 prevails only if picking up partners triggered the start of flagger-drivers' workday under 29 C.F.R. § 790.6(b), rendering travel from pickup to the worksite compensable as all in a day's work under 29 C.F.R. § 790.6(a).

### c.  Section 254(a)(1) does not independently exempt any activity that is compensable under section 254(a)(2)

The parties spill a fair amount of ink over section 254(a)(1) and normal travel time.  As mentioned above, the argument seems irrelevant because the applicability of section 254(a)(1)

likely turns on whether picking up/dropping off partners can be deemed an integral and indispensable activity for flagger-drivers.  According to regulations, the activities mentioned in section 254(a)(1) are simply expressed illustrations of the category of non-compensable preliminary and postliminary activities set forth in section 254(a)(2).  And, according to the Supreme Court, integral and indispensable activities are definitionally the opposite of preliminary and postliminary activities.  *Alvarez* held that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under [section 254(a)] of the [PPA]," where principal activities are compensable and preliminary/postliminary activities are not.  *Alvarez*, 546 U.S. at 37.  Additionally, the "travel[] to . . . the actual place of performance" language in section 254(a)(1) has been interpreted to mean that only the travel to the location of the first integral and indispensable activity is non-compensable.  *See id.* at 34 ("[W]e conclude that the locker rooms where the special safety gear is donned and doffed are the relevant 'place of performance' of the principal activity that was employed to perform within the meaning of [the PPA].").

Put another way, non-compensable travel under section 254(a)(1) ends when an employee undertakes their first principal *or* integral and indispensable activity (which are treated as the same thing).  Hence, questions around normal commute travel are likely irrelevant if transporting partners is an integral and indispensable activity.  Picking up and dropping off their partner would be the bookends to a flagger-driver's workday, 29 C.F.R. §§ 790.6(a)-(b), and the PPA has no bearing on travel *within* the workday, which is compensable.  29 C.F.R. § 790.6.  On the other hand, if transporting partners *were not* integral and indispensable to the flagger-driver's job, then such travel time is non-compensable under section 254(a)(2) anyway.  It appears that the PPA inquiry starts and ends with the integral and indispensable test.

Even if there are meaningful legal distinctions between section 254(a)(1) and (a)(2), neither side is entitled to summary judgment.  As mentioned in Section I.B, the DOL has evidence which, if believed, shows that transporting partners is a task that flagger-drivers are employed to perform.  If that were true, then a flagger-driver's time spent driving a crew member to and from the worksite would be compensable; the flagger-driver's commute would be limited to the leg of the trip from home to the designated pickup spot and then later from the drop-off location back to home.  Section 254(a)(1) would not apply to the travel time after the partner is picked up and before he or she is dropped off.

But AWP has put forward contrary evidence that, if believed over the DOL's evidence, would show there is no distinct job of a "flagger-driver," there are only flaggers.  Some flaggers have company trucks because they requested one, and receiving a truck does not impose an additional obligation to pick up a crew member on the way to work.  If transporting partners is voluntary, then section 254(a)(1) would apply to all travel to and from the worksite.  This is a genuinely disputed material fact.  The DOL has the burden of proving that section 254(a)(1) does not apply, and it has satisfied its burden of production in that regard.  AWP has provided evidence that contradicts the DOL's case.  Neither side is entitled to summary judgment.

### 2. Preliminary and postliminary activities under section 254(a)(2)

AWP also contends that time spent transporting partners is not compensable under section 254(a)(2) of the PPA because it is neither integral nor indispensable to the job of flagging, their employees' principal activity.  The DOL asserts that transporting partners is integral and indispensable because it is not possible for AWP employees to flag traffic in the typical flagging job unless they have a partner.

### a. AWP argues two flaggers are not needed to flag

Defendant states that "approximately 20% of the jobs AWP has performed involved a [flagger-driver] driving an AWP pickup truck to the customer's jobsite without picking up or dropping off any partner, but the [flagger-driver] nonetheless performed the principal activity of standing and directing traffic at the jobsite."  (Def.'s Mot. for Summ. J. 17, ECF No. 49.)  78,000 jobs were performed by a single flagger, 25,000 of which were also completed without the use of a company truck.  Moreover, AWP contends that employees are permitted to drive to jobsites using their personal vehicles, meaning no pickup or drop-off is required.  One employee allegedly drove her personal vehicle to jobsites frequently.  *See supra* Section I.B.  Flagging jobs are nevertheless successfully performed in all the above circumstances – with or without transporting a partner, with or without using an AWP truck.  Therefore, neither the use of company-provided vehicles nor the transportation of partners could be "indispensable" within the meaning of *Busk*.  If such activities are not indispensable to flagging, then they are merely preliminary/postliminary and non-compensable.

### b. AWP argues that partner transportation is not connected to flagging traffic

AWP says that the "method of traveling to and from jobsites" is not "intrinsically connected to standing and directing traffic" and thus not integral to the principal activity of flagging.  (Def.'s Mot. for Summ. J. 19.)  An activity is integral if it is a "component" of a principal activity.  *In re Amazon.com, Inc. Fulfillment Center Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 609 (6th Cir. 2017).  The Second Circuit defined integral as "'essential to completeness'; 'organically joined or linked'; 'composed of constituent parts making a whole.'"  *Gorman*, 488 F.3d at 592 (quoting Webster's Third New Int'l Dictionary 1152, 1510-11 (1986)).  AWP argues that transporting partners is not a component of flagging, nor is it essential to the

completeness of flagging operations.   Transporting partners cannot be integral because, as mentioned before, some portion of flagging jobs are completed without picking up partners, and some jobs involved no partners at all.

To support their position, AWP relies on *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006).  In *Smith*, several employees would meet in a convenience store parking lot to get into a single vehicle and drive a long distance to the oil rig where they worked.  *Id.* at 1277-80. The employer did not expressly require its employees to travel in a single vehicle.   Some employees said it was an unofficial policy due to the convenience of having an entire crew arrive at once and occasional restrictions imposed by limited parking space.  *Id.*  at 1280-81.  However, "[a]ccording to [the employer], the only thing it ever asked of its [employees] while they were traveling back and forth from the well sites was to drive safely," and there is no indication that any substantive work was performed during drives.  *Id.* at 1281-82.  The court ruled that the employees' travel time was not compensable.   *Id.* at 1292.   It reasoned that the "alleged carpooling requirement" would not be compensable "unless the plaintiffs' travel was an integral and indispensable part of their principal activities *because* they were traveling together with their crew."  *Id.* at 1288.   The court found that plaintiffs "were required to travel together for reasons related to the logistics of commuting rather than anything integral and indispensable to their principal activities."  *Id.*  And "the plaintiffs acknowledged that they would have traveled together even if their drillers did not require them to do so because it is more convenient than driving alone." *Id.*

*Smith* does not entitle AWP to summary judgment because the case is distinguishable when viewing the facts in the light most favorable to the DOL.  Under the Department's theory, traveling as a crew is integral and indispensable to flagging in crews.  Here, and unlike in *Smith*, the DOL

22

asserts that flaggers are unconditionally forbidden from parking at worksites.  This goes beyond

pure "logistical" commuting concerns, especially if it is true that a single flagger cannot perform

a standard flagging job alone.  Having an oil rig crew all arrive at the same time was a nicety, not

a necessity, in *Smith*.  If two employees are needed to perform a flagging job, and employees are

categorically forbidden from parking at the worksite, then the only way a flagging job could be

performed is if the flagger with the company truck transported a partner.  This would make such

partner transportation integral and indispensable to the activity of flagging.  And considering that

partner transportation adds 30 minutes to a flagger-driver's commute each way, it is hard to believe

that they are doing it for the sake of convenience.  There is no indication that flagger-drivers would

go so far out of their way to pick up their partners if they were not required to do so.  *Cf. Thacker

v. Halter Vegetation Mgmt., Inc.*, No. 2:13-cv-378, 2015 WL 417713, at *9-10 (S.D. Ind. Jan. 30,

2015) (finding non-compensable travel where driver "picked up a coworker on the way" and doing

so did not extend his commute).

AWP also points to *Luster v. AWP, Inc.*, No. 1:16-cv-2613, 2020 WL 6119418 (N.D. Ohio

Oct. 16, 2020), where the court dismissed a similar lawsuit against AWP for failure to state a claim.

The plaintiffs alleged that they must be compensated for time spent transporting partners, among

other activities.  The plaintiffs claimed that they were required to pick up and drop off their

partners, and that having a partner was key to workplace safety while flagging.  *Id.* at *5.  The

court concluded that the plaintiffs "simply have not shown that the activities they highlight are

intrinsic aspects of the work of [flagging] or are indispensable to that work." *Id.*

However, it appears that this conclusion stemmed from deficiencies in the complaint itself:

the plaintiffs' allegations that certain activities were integral and indispensable were characterized

as "inappropriately formulaic." *Id.*  Because partner transportation was just one of many activities

that plaintiffs claimed was compensable, it is a little difficult to parse the court's thinking on the issue of transportation specifically.  The court did note that reporting to an employer-designated location could render certain activities compensable, provided that plaintiffs did some "'work . . . before leaving for the job site.'"  *Id.* at *6 (quoting *Chao v. Akron Insulation & Supply, Inc.*, 184 F. App'x 508, 511 (6th Cir. 2006)).  The requirement that additional work be performed at the designated location before certain activities are compensable does not perfectly accord with Supreme Court doctrine, *see Alvarez*, 546 U.S. at 36 (citing 29 C.F.R. § 785.38 with approval), and *Luster* may construe "work" too narrowly in interpreting *Chao*.  Indeed, *Chao* states that "[e]xamples of activities during 'shop time' that are integral to principal activities include *reporting to a designated meeting place*, receiving assignments, and loading equipment."  *Chao*, 184 F. App'x at 510 (emphasis added).  The quote from *Chao* cited in *Luster* was a statement of fact, not a recitation of law.  *Chao* gives a straightforward application of 29 C.F.R. § 785.38.  Ultimately, *Luster* does not address the key question presented here: is picking up a partner integral and indispensable to flagging, thereby triggering the start of a flagger-driver's workday?

### c. DOL argues that picking up and dropping off partners are the start and end of flagger-drivers' workdays

The DOL posits that transporting partners is both integral and indispensable to an AWP flagger-driver's principal activity of flagging traffic.  Because transporting partners is integral and indispensable, the activity itself is a principal one.  Picking up and dropping off partners therefore demarcate the start and end of a flagger-driver's workday, and under 29 C.F.R. § 790.6(a), all travel within a workday is compensable.  Crucial to the DOL's position is their framing of AWP's operations: first and foremost, AWP's service is the provision of two-person flagging crews driving a company-provided pickup truck that is specially equipped for traffic flagging jobs.  According to the DOL, it makes no sense to conceive of a flagger's principal activity as flagging

in isolation.  To analogize, it is the difference between a lumberjack using an ax to cut down a tree and two lumberjacks using a two-person saw to cut down a much larger tree.  Are they really the same job with the same principal activity of felling trees?  Or is the two-person job substantively different enough such that a second crew member is indispensable to the activity of cutting a tree with a two-person saw?  The way the principal activity is framed matters.

The DOL points out that only around 5% of jobs completed by AWP involved single flaggers.  (Peak Dep. 206.)  The standard service provided by AWP is a pickup truck with a two-person flagging crew.  Hence, having a partner is an integral component for the vast majority of flagging jobs.  AWP has even integrated partner pick-ups in its time-keeping system: on a tablet, flagger-drivers must mark, in real time, when they first depart, when they pick up their partner, and when they arrive at the worksite.  (Training Manual, ECF No. 57-4.)  Former flagger-drivers state that transporting partners was mandatory and that employees were not permitted to drive their personal vehicles to worksites.  AWP's assertions to the contrary are belied by the nightly job assignment process, where a flagger-driver is assigned a worksite and partner for the following day, with the expectation that the employees will organize a pickup spot for the morning.  At the Niles facility, only a single employee was known to drive her own car to jobsites, and Plaintiff suggests she was permitted to do so because AWP perceived it would be legally advantageous.  A former facility manager at Niles stated that employees were not permitted to park at worksites while he was manager.  (MacLachlan Dep. 45, ECF No. 51-8.)

The DOL analogizes the situation to 29 C.F.R. § 785.38, which states that employees must be compensated for travel time occurring after an employee reports to an employer-designated location to pick up tools required for a job.  *See also Chao*, 184 F. App'x at 510-11 (same); *Meeks v. Pasco Cnty. Sheriff*, 688 F. App'x 714, 717 (11th Cir. 2017) (officer's pick up and transport of

patrol car between secured facility and patrol zone compensable).  Here, partners are the equivalent of necessary tools, and AWP is indirectly designating an initial meeting location – anywhere *but* the jobsite.  Moreover, AWP presumably compensated employees for travel time to worksites under their central reporting system that made flaggers first report to the local AWP facility to gather tools and a company vehicle.  "It would be wholly incongruous to determine the pickup of tools is 'integral and indispensable' but not the pickup of employees who are required for a two - man crew."  (Pl.'s Mot. for Summ. J. 19, ECF No. 51.)  It is irrelevant that flagger-drivers do no work beyond simply letting their partner into a car, because physical exertion is not required for something to constitute work under the FLSA.  *Alvarez*, 546 U.S. at 25.

Transporting partners is also indispensable, because the standard AWP flagging job consists of two flaggers and such flaggers are not permitted to park their own vehicles at the worksite.  Given the parking constraint, it would not be possible to dispatch two flaggers to a worksite unless the flagger-driver first picked up his partner.  The DOL notes that the alleged 25,000 single-flagger no-truck jobs cited by AWP lack key context.  This is a major question: are nonstandard jobs essentially the same work with the same requirements?  If so, then the 25,000 jobs indicate that having two flaggers is *per se* dispensable to the job of flagging.  If, on the other hand, there are qualitative differences between the jobs for which one flagger is assigned rather than two, such that they are really different flagging operations that should not be compared, then the existence of single-person flagging jobs would have no bearing on the indispensability of transporting partners for two-flagger jobs.  The Court returns to its lumberjack analogy: is the standard AWP job the type of work a person could perform alone?  The record before the Court does not provide an undisputed answer.

To the extent AWP uses two-person crews due to safety concerns for flaggers, case law favors a finding that having a partner is integral and indispensable to flagging. As the DOL puts it, "[j]ust because a flagging job *can* be performed with only one flagger does not mean it can be performed safely and effectively." (Pl.'s Sur-Reply Br., ECF No. 54, PageID.1180.) Donning protective gear before working with battery chemicals was held an integrable and indispensable activity because, although employees could theoretically handle the chemicals without protective gear, they could not do so safely. *Steiner*, 350 U.S. at 250-53. Time spent by meatpackers sharpening knives was integral and indispensable because, although they could do the job with dull knives, doing so would slow production and increase accidents. *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956); see *also Alvarez*, 546 U.S. at 33 (meatpackers' time spent donning and doffing protective gear compensable). Employee safety is therefore a relevant consideration in the integral and indispensable inquiry, at least to the extent unsafe conditions would inhibit worker productivity. However, the types of injuries to be prevented in *Steiner* and *Mitchell* seemed more certain to occur than whatever might befall a flagger who lacks a spotter while setting up and breaking down a worksite. This does not defeat the DOL's safety argument, but it is not as strong compared to the facts in *Steiner* and *Mitchell*.

### d. 29 C.F.R. § 785.38 only requires compensation if a flagger-driver's workday has begun

It is not perfectly clear whether the DOL is arguing that picking up a partner constitutes the beginning of a workday under 29 C.F.R. § 785.38, or whether part 785.38 renders subsequent travel time compensable regardless of whether a flagger-driver's workday has actually begun. However, *Busk* seems to hold that pre-workday activities are only compensable if they are integral and indispensable to an employee's principal activity. DOL's argument only works if transporting partners is an integral and indispensable activity that starts the workday. And *Busk* also forecloses

27

the notion that reporting to a designated location could be *per se* integral and indispensable to all employees' principal activities. *Busk* requires focusing on the work the employee was hired to perform to determine whether other activities are integral and indispensable to that primary function. *Busk*, 574 U.S. at 36. Part 785.38 only governs if, in this particular case, transporting partners is integral and indispensable to the principal activity of flagging. Nevertheless, the DOL points to a case supporting their position, *Wilson*, which held that "employees must be paid for travel time after their employer requires them to report to a designated meeting place." *Wilson*, 2017 WL 2869341, at *8 (citing 29 C.F.R. § 785.38).[8]

In *Wilson*, the employer required plaintiff-employees to carpool to work, and "direct[ed] those employees to find a mutually agreeable meeting spot." *Id.* at *8 n.81. The defendant argued that none of the time spent traveling to work was compensable. The court disagreed, stating that "the ECFA only applies to 'travel from an employee's home to the first work location at the start of the workday.'" *Id.* (quoting *Lacy v. Reddy Elec. Co.*, No. 3:11-cv-52, 2013 WL 2580309, at *6 (S.D. Ohio July 11, 2013)). Though specifically referring to the ECFA, this holding applied to the PPA as a whole, because the court found the travel time from the carpool spot to the worksite must be compensated. *Id.* *Wilson* approves of part 785.38 and interprets the Sixth Circuit decision in *Chao* to mean that merely showing up to a designated location, without doing more work there, is sufficient to trigger the start of the workday. *Id.*

AWP argues that the case was wrongly decided. Defendant says that the *Wilson* court failed to properly account for *Busk*, which does appear to preclude any notion that simply requiring an employee to report to an initial location is sufficient to render subsequent travel time

---

[8] *Wilson* principally addresses the application of the ECFA, but since the ECFA is integrated into the PPA and the case also deals with integral and indispensable activities, *Wilson* provides guidance in interpreting section 254(a)(2) of the PPA and the provision's interaction with the continuous workday doctrine.

compensable.  Nevertheless, assuming transporting partners is integral and indispensable, *Wilson* supports the position that picking up/dropping off a partner demarcates a flagger-driver's workday.

To sum up, AWP argues that it deserves summary judgment because the DOL has failed to demonstrate that transporting partners is an integral and indispensable activity of flagger-drivers.  The Department believes that is has shown just that.  Because there are genuine disputes of material fact on this issue, neither party is entitled to summary judgment.

### e. Genuine dispute regarding whether transporting partners is integral and indispensable prohibits summary judgment

There are genuine disputes as to whether flagger-drivers carry extra duties that are part of a job that is distinguishable from flagging itself, whether flagging is a two-person job, and whether flaggers are permitted to drive personal vehicles to worksites.  These factual questions are material because they will "affect the outcome of the suit." *Anderson*, 477 U.S. at 248.  These facts must be ascertained to determine whether partner transportation is a principal activity of a flagger-driver or whether it is integral and indispensable to flagging.  Time spent transporting partners is not compensable unless it is a flagger-driver's principal activity or integral and indispensable to flagging.  If transporting partners is integral and indispensable, then picking up a partner would be the start of a flagger-driver's workday, and dropping that partner off would be the end, rendering all travel time in between compensable.

Transporting partners could not be integral and indispensable to flagging if the type of flagging conducted by AWP could be performed by a single person.  Declarations provided by the DOL state that flagging jobs cannot be accomplished without two flaggers.  AWP has put forward statistics indicating that flaggers do sometimes flag without a partner.  While true that the numbers provided are not broken down by job type, based on the evidence presented by the DOL, the Court is unable to say with certainty that the type of flagging operations at issue in this case are

fundamentally two-person jobs.  More information on flagging is needed to determine whether a flagger needs a partner to perform the type of work AWP offers to its customers.

The DOL's objection that the figures provided by AWP cannot be considered because they are inadmissible hearsay is irrelevant here.  It is true that inadmissible hearsay put forward by the movant "cannot be considered on a motion for summary judgment."  *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).  But the Court is only restricted by admissibility when considering evidence presented by the *movant*.  *See Mauro v. Cnty. of Macomb*, No. 16-11533, 2018 WL 2431631, at *11 (E.D. Mich. May 30, 2018) (clarifying rule only prohibits consideration of *inadmissible* hearsay).  Here, the DOL is the one moving for summary judgment.  AWP is not similarly constrained.  *See Celotex*, 477 U.S. at 324 (evidence presented by *nonmoving* party need not be admissible at trial to be considered by court on summary judgment).

The ability of flaggers to drive their personal vehicles to worksites also determines whether partner transportation is integral and indispensable.  Even assuming that flagging is a two-person job, the DOL could not win without proving that flagger-drivers are required to pick up partners because employees are forbidden from parking personal cars at the jobsite.  Otherwise, partner transportation would be dispensable under *Busk*.  There would be no need for flagger-drivers to pick up their partner if the partner could simply drive their own car and meet the flagger-driver at the work zone.  In that case, partner transportation would just be a preliminary/postliminary activity – exempted from compensation under the PPA.

Of course, partner transportation would only count as a preliminary/postliminary activity if it were not a principal activity by virtue of a flagger-driver's purpose.  An employee can have more than one principal activity.  If picking up and dropping off crew members is part of the "productive work" that flagger-drivers are "*employed to perform*," then they must be compensated

for doing so.  *Busk*, 574 U.S. at 36 (citing *Alvarez*, 546 U.S. at 42) (emphasis in original).  The PPA and ECFA only apply to activities that, strictly speaking, employees are not employed to perform but are nevertheless necessary to performing principal activities.  One cannot do their job without going to their job, but the PPA renders commutes non-compensable.  However, if the activity in question is one that the employer actually hired the employee to perform, then the PPA and ECFA have no application and the FLSA requires compensation.  For example, a junior lawyer may be hired to draft briefs *and* review documents – both activities are part of the lawyer's role and must be compensated.  So too with flagger-drivers, if such a job exists.  A flagger-driver has two principal activities: flagging and transporting other flaggers.  Both activities would be compensable.

But AWP disputes the existence of flagger-drivers as a distinct role.  DOL has marshaled many witnesses claiming that flagger-drivers are required to transport crew members by virtue of having a company-provided truck.  AWP has its own witnesses who say that picking up partners is essentially voluntary since everyone is allowed to drive their own car to worksites.  In that scenario, some flaggers sign up to receive a company truck simply because they want one for one reason or another, not because they believe they are taking on a new role with additional responsibilities.  Credibility determinations must be made to resolve this contradiction, and that task is reserved to a jury.

### 3. The ECFA

As stated in Section III.A.3, use of an employer-provided vehicle is exempted from compensation by the ECFA if it is used: (1) for commuting or incidental to commuting; (2) within the normal commuting area and; (3) subject to a vehicle-use agreement between the employer and employee.  The ECFA does not define the terms "incidental" or "normal commuting area," and neither the Supreme Court nor the Sixth Circuit have addressed their meaning.  As will be

explained below, the proper inquiry for "incidental" is the degree to which the activity in question stems from an employee's commute versus an employee's principal activity or activities.

Because there are genuine disputes of material fact regarding whether partner transportation is incidental to a flagger-driver's commute, neither party is entitled to summary judgment under the ECFA.  AWP centers its ECFA argument on the definition of "normal commuting area."  The Court will not address that argument because summary judgment is inappropriate even if AWP wins on that point.  The first element of the ECFA cannot be decided at this stage of litigation.

An undefined statutory term must be interpreted according to the word's ordinary meaning at the time of the statute's enactment.  *United States v. Shepherd*, 922 F.3d 753, 758 (6th Cir. 2019) (citing *Keeley v. Whitaker*, 910 F.3d 878, 882 (6th Cir. 2018)).  Dictionaries that "are 'roughly contemporaneous' with the statute's enactment" should be used.  *Id.* (quoting *Freytag v. C.I.R.*, 501 U.S. 868, 920 (1991)).  The Oxford English Dictionary defines "incidental" as "[o]ccurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual."  *Incidental*, Oxford English Dictionary (2d ed. 1989).  Black's Law Dictionary defines the term as "[s]ubordinate to something of greater importance; having a minor role."  *Incidental*, Black's Law Dictionary (11th ed. 2019).

Legislative history provides some color: "[i]t is not possible to define in all circumstances what specific tasks and activities would be considered 'incidental.' . . . Communication . . . [or] routine vehicle safety inspections or other minor tasks have long been considered . . . not compensable."  H.R. Rep. No. 104-585, at 5.  The Sixth Circuit has held that a K-9 officer's obligations to clean up after his police dog in his employer-provided squad car and conduct maintenance on the vehicle were activities "incidental" to his use of the car for commuting and

thus non-compensable under the ECFA. *Aiken*, 190 F.3d at 759.  But that case did not provide any operative definition of "incidental."

Other Circuit Courts have made determinations about whether particular activities are incidental in certain contexts but also have not provided any broader definition.  *See Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1053 (9th Cir. 2010) (restrictions on employee's personal use of employer-provided vehicle did not render commute itself a principal activity); *Singh v. City of New York*, 524 F.3d 361, 367-69 (2d Cir. 2008) (carrying briefcase containing important documents during commute incidental to commute, insufficient to render commute time compensable); *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (prohibition on making personal stops during commute did not render commute non-incidental).

The Court finds that something is incidental if it is an outgrowth of an employee's commute rather than an employee's principal activity or activities.  Simply determining whether an activity is integral and indispensable does not conclusively resolve the incidental inquiry.  Although integral and indispensable activities often are not incidental to commuting, "integral and indispensable" and "incidental" are not mutually exclusive.  The language of the ECFA states that activities that are incidental to commuting "shall not be considered part of the employee's principal activities."  29 U.S.C. § 254(a)(2).  Therefore, an activity may still be covered by the ECFA even where it is integral and indispensable.  The key inquiry is whether the activity in question is a natural consequence of commuting itself.  Activities that may be integral and indispensable but are an inevitable outgrowth of commuting are non-compensable under the ECFA.  Such non-compensable activities are relatively few, however, because most integral and indispensable activities are closely tied to an employee's job rather than his or her commute.

33

Under the DOL's theory of the case, transporting a partner could not be incidental to commuting.  In the DOL's view, the flagging aspect of the flagger-driver's job requires at least two people, and flaggers have no way of getting to the worksite without a company vehicle since personal cars may not be parked at jobsites.  Transporting a partner would not be some natural and minor consequence of driving a company vehicle to work – transporting a partner would be necessary to perform the work at all.  Circuit courts have primarily dealt with restrictions that accompany an employer-assigned vehicle.  This case does not deal with restrictions, but an alleged additional duty: one must drive partners to and from work.  This is not analogous to activities that are incidental because they relate to the actual means of getting to work.  Whether a flagger-driver is driving his or her own car or a company car, that vehicle must be maintained to be used for commuting.  But there is little reason to believe that, in the absence of assigned company vehicles, flagger-drivers would go so far out of their way to pick up partners with a personal vehicle. According to the DOL, transporting a partner has nothing to do with commuting and everything to do with the practical realities of executing a two-person job at locations where personal vehicles are prohibited.  The purpose of assigning company vehicles is not just to facilitate commuting, but to enable flagging work in the first place.

If AWP's evidence is believed, on the other hand, then employees may park personal vehicles at job sites and flagging can be performed individually.  Transporting partners is incidental to commuting where it is entirely voluntary and unnecessary.  A flagger-driver is simply saying "I will pick you up on my way to work," modifying his commute to accommodate a coworker.  In that scenario, a flagger-driver's use of the company vehicle to pick up a partner is purely incidental to his or her commute.  The ECFA would render any additional travel time non-compensable.

This is a genuine dispute of material fact.  The ECFA would not apply if flagger-drivers transport partners because it is part of their job or an integral component of flagging because such activity would not be incidental to commuting.  Thus, the question of whether transporting partners is "incidental" to a flagger-driver's commute cannot be resolved now either.  The DOL cannot definitively show that the ECFA does not apply to flagger-drivers' travel time, and AWP cannot demonstrate that the Department has unquestionably failed to do so.  Summary judgment will not be granted on the basis of the ECFA.

### C. Miscellaneous Issues

Although not the main thrust of its argument, the DOL also argues that driving AWP trucks renders travel time compensable because the vehicles are "mobile offices."  (Pl.'s Mot. for Summ. J. 21.)  This is a losing argument.  Though the trucks are arguably essential to flagging jobs – they contain necessary tools, block traffic, and sometimes are equipped with lights to warn drivers to change lanes – the mere transportation of tools (without first reporting to a designated location to receive said tools) is insufficient to render commute time compensable.  *See Aiken*, 190 F.3d at 755, 758 (canine officers not entitled to compensation for traveling to and from homes with canines even though dogs were vital tool of their job).

Another matter is the *de minimis* exception.  Employers do not violate FLSA for failing to account or pay for otherwise compensable activities when the time employees spend performing those activities are negligible.  *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 176 (7th Cir. 2011) ("The *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute.").  An employer bears the burden of establishing that the *de minimis* doctrine applies.  In an attempt to swat down a hypothetical *de minimis* argument, the DOL cites a three-factor test from *Brock v.*

*City of Cincinnati*, 236 F.3d 793, 805 (6th Cir. 2001) to demonstrate why the *de minimis* rule is inapplicable here.

But analysis of the *de minimis* doctrine is unnecessary here as AWP has not made any serious attempt to argue that the doctrine applies.  In their reply brief, AWP states that "[s]topping a vehicle for a few seconds is hardly a significant amount of work," but it is not clear that this is really in reference to the *de minimis* doctrine and they do not apply the three-factor test.  (Def.'s Rep. Br. 2, ECF No. 53.)  Defendant further hinted that the *de minimis* exception might apply during oral argument, but again did not go through the necessary factors.  AWP cannot meet its burden if it does not raise the *de minimis* argument in the first place.

### D. DOL's Objections to Declarations Provided by AWP

In a separate motion, the DOL asserts that several declarations provided by AWP contain evidence that would be inadmissible at trial.  (ECF No. 58.)  The standard for summary judgment renders this motion moot.

The DOL asks the Court to not consider portions of four declarations it finds objectionable. If the motion were granted in full, the Court would disregard paragraphs 4-18 and 24 of Jack Peak's first declaration (ECF No. 49-9), paragraphs 2-9 and 17 of Peak's supplemental declaration (ECF No. 53-2), and the entirety of Josh Martin's (ECF No. 49-10) and Shaun Plencner's (ECF No. 49-11) declarations.  Broadly speaking, the challenged statements are either relevant to the question of liquidated damages, which is no longer being litigated, or buttress AWP's overarching claims that flaggers are permitted to drive personal vehicles to worksites, that two people are not needed to flag, and that the driving undertaken by flagger-drivers in Niles does not lie outside the normal commute of AWP flagger-drivers as a whole.

The portions relevant to the question of liquidated damages are moot because the DOL has stated its intent to drop its claim for liquidated damages.  And the portions of the declarations

relating to the facts listed above constitute *some* but not *all* of AWP's evidence establishing those facts. Summary judgment is only appropriate where a party fails to muster evidence sufficient to create a genuine dispute of material fact. The amount of evidence is irrelevant beyond what is required to create a genuine dispute – a party is not entitled to summary judgment simply because it has four witness while the opposing side has only one.

The DOL would certainly win its own summary judgment if AWP had no evidence. But AWP does, and it has evidence beyond the challenged declarations. Even if the challenged declarations were disregarded, the DOL would not be entitled to summary judgment for all the reasons previously stated. And regardless of whether the Court considers the challenged evidence, AWP is not entitled to summary judgment for all the reasons stated in this opinion. That would be true even if striking the declarations left AWP with no evidence at all. The outcome of either motion for summary judgment would be unaffected by any disposition of Plaintiff's objection. The objection is therefore moot.

### IV. Conclusion

This case turns on two questions: (1) whether flagger-drivers are employed to transport flagger-passengers in addition to performing traffic management; and (2) whether transporting crew members is integral and indispensable to the principal activity of flagging. If the answer to the first question is yes, then the FLSA demands compensation, and the PPA and ECFA have no application to an employee's performance of a principal activity. If the answer to the second question is yes, then transporting partners is treated as a principal activity of flagger-drivers. In that case, picking up a partner would trigger the start of a flagger-driver's workday, and dropping that partner off would terminate the driver's workday – all travel time between those bookends would be compensable.

Both parties have put forward contradicting evidence speaking to facts that would determine both questions above.  Summary judgment may not be granted when there are genuine disputes of material fact.  Therefore, both motions for summary judgment will be denied except with respect to the DOL's claim for liquidated damages.  AWP's motion for summary judgment will granted in that regard alone.  Plaintiff's objection to some of Defendant's declarations will be denied as moot.  An order will enter consistent with this opinion.


Dated:   December 23, 2020                              /s/ Hala Y. Jarbou
                                                        HALA Y. JARBOU
                                                        UNITED STATES DISTRICT JUDGE